## COMMONWEALTH *versus* JAMES BLANDING.

A libel was published in a newspaper printed in another State, but which usually circulated in a county in this State, and the number containing the libel was actually received and circulated in such county. *Held*, that this was competent and conclusive evidence of a publication within such county.

The malicious intent charged in an indictment for a libel, where the truth of the facts contained in the libel is not admitted in evidence, is an inference of law.

The provision in the constitution securing the liberty of the press, was intended to prevent any previous restraints upon publications, and not to affect prosecutions for the abuse of such liberty.

The general rule is, that upon indictment the truth of a libel is not admissible in evidence. Whether in any particular case such evidence is admissible, is to be determined by the court ; and if admitted, the jury are to determine whether the publication was made with good motives and for justifiable ends.

On an indictment for a libel published in a newspaper, charging a person with misconduct as an innkeeper, for which he was liable to punishment, it was *held*, that the truth of the libel was not admissible in evidence.

Publishing a correct account of a judicial proceeding, but with comments and insinuations tending to asperse a man's character, is libellous.

THIS was an indictment charging the defendant with making, framing and causing to be published in a newspaper, called the Providence Gazette, at Rehoboth, in the county of Bristol, on the 20th of February, 1822, a false, scandalous and libellous paragraph concerning one Enoch Fowler, he then being an innholder in that county, and a good and peaceable citizen, &c.

On the trial, before *Wilde* J., it was proved that the defendant delivered the writing set forth in the indictment to the printer of the Providence Gazette, at Providence, in the State of Rhode Island, and that it was published in that paper at the request of the defendant, who acknowledged that he was the author of it ; and it was proved that that paper circulates in Rehoboth, and had so circulated previously to such publication ; and that the number containing this writing was received and circulated in that town.

The defendant offered to give in evidence a coroner's inquest alluded to in the libel, to prove that the allegations contained therein were true ; and he also offered to prove the truth of all the allegations in the writing. But this evidence was not admitted.

The defendant contended that there was no evidence that the writing was composed or published in the county of Bristol ; but the jury were instructed, that the causing of it to be published in the Providence Gazette, the defendant knowing that that newspaper was taken and circulated in Rehoboth, was a sufficient publication within the county.

The jury were also instructed, that the malicious intent charged in the indictment was an inference of law, it not being competent for the defendant to prove the truth of the facts alleged, and there being no such proof in the case ; and that although the jury were, with the advice of the Court, the judges of the law and the fact, yet they were bound to decide according to the law as actually established, whatever might be their opinion of its policy ; and that unless they knew the law to be otherwise, they ought to receive it from the judge, whose instructions, if incorrect, would be subject to revision and correction by the whole Court.

A verdict was returned against the defendant ; but if these instructions were wrong, or if the evidence offered by the defendant should have been admitted, the verdict was to be set aside and a new trial granted, or the defendant was to be discharged, according as the whole Court might direct.

*Nov.* 16*th.*   *W. Baylies* for the defendant.   The supposed libel contains a just representation of the verdict of the coroner's jury, accompanied with temperate and useful remarks.   The defendant offered in evidence the inquest, and proposed to prove that all the allegations in the supposed libel were true.   This evidence, which was rejected, ought to have been admitted, to show the intent with which the publication was made.   We do not say it would be conclusive, or that the facts, if true, would be a justification, but it was proper and pertinent evidence to go to the jury.   We wished to show that the defendant was not influenced by malice, but by a regard to the public interest. The jury were instructed that the intent and tendency of the writing were inferences of law ; that it was immaterial whethe it were true or not ; that they had power to determine th law, but that they would do it on their own responsibility If this is the law, it is founded on authority only, and not upon reason.   To say that the intent is not a question for the jury

.nat any writing containing an accusation, whether true or false, is a libel, appears as unreasonable as it would be to adopt the sentiment of an ingenious writer, that every person should be at liberty to publish every thing, and the public should be left to judge, from the collision of statements, what is true and what false. It may be considered by the Attorney-General, and perhaps by the Court, that the law of libel is settled by the English authorities, and that we are bound by them. By Mr. Fox's bill, and the discussion to which it gave rise, it appears that it was formerly held to be the law of England, that whether a writing were a libel or not, was to be determined by the Court. The question is now to be decided, whether the law, as laid down by Lord *Mansfield* and the other judges, is the law of this commonwealth. Mr. Fox's bill in some measure enlarges the power of the jury, and tends to prevent the encroachment of arbitrary judges ;. the jury are no longer told in England, that the intent and tendency of a writing are mere inferences of law. But that bill never became the law of this land. [*Attorney-General.* The principle of it has always been the law of this land.] It was held by *Lewis* C. J. that it was not the law of New York. We must then go up to the Court of Star Chamber for our law of libel, if the instructions at the trial were correct. We understand that the learned judge laid down the law as it was laid down by Lord *Mansfield ;* that the intention was to be collected from the paper itself ; that it was an inference of law, and that the jury were to take the law from the Court ; that though they had the physical power, by returning a general verdict, to determine the law, they had not the right. There has always been a collision on this subject between the court and the jury. Mr. Burke, in his Speech on a Bill for explaining the Powers of Juries in Prosecutions for Libels, considers the courts as having improperly departed from the ancient common law. He says, " The doctrine in the case of a trial by indictment or information for a libel, laid down by several judges, amounts to this, that the jury have no competence where a libel is alleged, except to find the gross corporeal facts of the writing and the publication, together with the identity of the things and persons to which it refers ; but that the

307

intent and tendency of the work, in which intent and tendency the whole criminality consists, is the sole and exclusive province of the judge.    Thus having reduced the jury to the cognizance of facts not in themselves presumptively criminal, but actions neutral and indifferent, the whole matter in which the subject has any concern or interest, is taken out of the hands of the jury ; and if the jury take more upon themselves, what they so take is contrary to their duty ; it is no *moral* but merely a *natural* power, the same by which they may do any other improper act, the same by which they may even perjure themselves with regard to any other part of the issue before them.'' Burke's Works, *vol. 5, p.* 324.

But the law of libel, even as now expounded in England, is not free from absurdity ; as is shown in a review of Holt's Law of Libel, in Edinb. Rev. *No.* 53, *p.* 102.    By their law, the presumption is as strong that a party publishes maliciously what is true, as well as what is false.    Holt, 55, 56.    This is absurd.    The judges there have been embarrassed by their own decisions.    In some cases they admit the truth in evidence ; and in others they reject it.    *Rex* v. *Horne,* Cowp. 575 ; *People* v. *Croswell,* 3 Johns. Cas. 389 ; Holt, 171. In *Rex* v. *Burdett,* 4 Barn. & Ald. 147, 324, *Bayley* J. says, that in some cases the falsehood may be the very essence of the libel ; instancing the case of a man's being charged with having been convicted of perjury.    So it is in regard to comments on literary works and places of public amusement.    3 Selw. N. P. 926 ; 1 Russell on Crimes, 333, 334.    The conclusion we come to is, that the doctrine of excluding the truth is against reason, against the policy of our free representative government, and against the original grounds of the common law, as clearly shown by *Kent* J. in 3 Johns. Cas. 384, whose opinion is acquiesced in by *Thompson* J.

It is there shown also, that this doctrine is not agreeable to the constitution of the United States, nor to that of New York.    And our own constitution provides, that the freedom of the press shall not be infringed.    It will be said, this means that there shall be no previous inhibition against publishing any thing.    If that is all, the provision is illusory.    The freedom of the press, however, as defined by Hamilton, *arguendo,*

<div style="text-align: right">Common-<br>wealth<br>v.<br>Blanding.</div>

(3 Johns. Cas. 352,) " consists in publishing with impunity, truth with good motives and for justifiable ends, whether it relates to men or measures." This definition is adopted by *Kent* J. (ibid. 393), and in this sense, it is apprehended, the terms *liberty of the press* were used in our constitution.

The Attorney-General will rely on the case of *Commonwealth* v. *Clap*, 4 Mass. R. 163, in which evidence of the truth of the libel was rejected. That was the case of a libel posted up in the streets, containing only general invective. The case may be law, without affecting the one now before the Court. And *Parsons* C. J. there makes a very sensible exception to the general rule, though it is not to be found in the books, namely, that the character of a candidate for a public elective office is a proper subject of remark ; and upon the ground, that it is the interest of the people to know his merits. The case at bar comes within the same principle. It concerns the people to know that the prosecutor kept a public house in an improper manner. It was serving the cause of morals and religion to hold his house up to public reprobation.

In 1805 a report was made and accepted in the House of Representatives, on the subject of a piece published in the New England Palladium, entitled the Monarchy of Federalism, in which report it is said, that our political institutions insure to every citizen the right " to publish truth from good motives and for justifiable ends, although it reflects on government, magistrates or individuals," and " that the law of England, on the subject of libels, which holds that the greater the truth is, the greater is the libel, is not the law of this land."

A resolution declaratory of the law of libel was introduced in the convention of 1820 for revising our constitution ; and in the debate upon it Mr. Jackson, then a justice of this Court, said, " The principle of the law is, that one may always publish the truth from right motives and for justifiable ends." Mass. Convention, *p.* 244. This contains all that we contend for in the present case. It is a deliberate opinion, and is entitled to at least as much weight as an opinion at *nisi prius*. He puts a case. " Suppose an apothecary in vending medicines, sells those which are poisons, no one can doubt that it is my duty to inform."

<div style="text-align: right">309</div>

A distinction is sometimes made between libels whic̵h charge one with a triable offence, and those which do not ; but it is apprehended that the distinction is not well founded. Suppose that a company of swindlers have gone from this State to New York, will it be libellous to write that such persons are swindlers, and that they have gone to New York ? So we sometimes see advertisements that such a stagecoach or stage tavern is ill kept. If this is intended for the public good, it is justifiable.

It will be said, however, that a libel, though true, is criminal, because it tends to a breach of the peace. This is a gross fiction. Whether it has that tendency is a question of fact. Would the Court permit the defendant to show that the prosecutor was so peaceable a man that there was no danger of a breach of the peace ? The true ground is, that a libel is an attack on a man's character, against which he is entitled to protection. On the other ground, the law punishes more heavily what only tends to a breach of the peace, than an actual breach. What becomes of this regard for the peace, when a man is permitted to utter verbal defamation in a public assembly, without being subject to a criminal prosecution ? Edinb. Rev. *No.* 53, *p.* 127.

It will be said, it is hard that a man's character should be defamed behind his back at the trial, when he is not a party to the suit, and has no opportunity to defend his character. This may have more weight in public than in private libels. In the latter class the person libelled is generally the prosecutor, and in this particular instance he was both prosecutor and witness. In England, the court refuses to grant an information for a private libel charging a particular offence, unless the prosecutor will upon oath deny the charge.

Another ground which we take is, that this inquisition was a judicial proceeding ; and a fair statement of it, accompanied with defamatory inferences, is not a libel. Holt, 171, 173 ; *Rex* v. *Wright,* 8 T. R. 293, 297.

There was no evidence of a publication in the county of Bristol. The defendant gave the writing to the printer in Rhode Island. The presumption is that it was written and published where it was first seen, which was in that State. Putting the

piece in a paper printed in another State, in the publication ol which the defendant had no agency, is not a publication in the county of Bristol. Merely knowing that the paper would circulate there is not sufficient. In *Rex* v. *Burdett*, 4 Barn. & Ald. 147, *Bayley* J. held that the whole *corpus delicti* must be in the county. Burdett lived in Leicestershire, and there wrote the libel, which appeared in a paper printed in London. He was indicted in Leicestershire, and the object was to prove a publication there. The writing was delivered to an agent in that county, and when it was received in London it was in an envelope, and the jury were told that it might be presumed to have been in an open envelope when it was delivered to the agent. Now if the circulation of the paper in Leicestershire had been sufficient evidence of publication, recourse would not have been had to this narrow point of the libel's going sealed or unsealed to London.

*Morton*, Attorney-General, for the prosecution, said it had never been denied in this commonwealth, that the jury had a right to determine the law and the fact, on an indictment for a libel. This Court had never told the jury to determine the fact of publication and the truth of the innuendoes, and leave the question of libel or not to the Court.

The reason why the government takes notice of a libel, is because it tends to a breach of the peace ; consequently the truth of it is immaterial and inadmissible in evidence. But there are some exceptions, as in the case of a petition to parliament, a complaint to a court of justice, and some others. *Lake* v. *King*, 1 Saund. 133 ; Skin. 124 ; *Rex* v. *Wright*, 8 T. R. 293 ; *Commonwealth* v. *Clap*, 4 Mass. R. 163. If the defendant had with upright motives made this representation to the court of sessions, in order to prevent a renewal of Fowler's license to keep an inn, it would not have been libellous ; and that was his proper course to pursue. It was his going beyond that which proves the malice.

The obvious meaning of the liberty of the press is that there shall be no previous restraint on publications. 4 Bl Com. 151, *et seq.*

He also insisted that there was sufficient proof of a publication in the county of Bristol.

<div align="right">Common-<br>wealth.<br><i>v.</i><br>Blanding.</div>

<div align="right">311</div>

<div style="float:left">Common-<br>wealth<br>*v.*<br>Blanding.<br>*April term*<br>1826, *at*<br>*Taunton.*</div>

PARKER C. J. delivered the opinion of the Court. As to the first question, which relates to the publication of the supposed libel, we think the admitted facts, that it was at the request of the defendant inserted in a public newspaper printed in Providence, which, though in another State, borders on the county of Bristol, and that that paper usually circulates in the town of Rehoboth in that county, and that the number containing the libel was actually received and did circulate in that town, were competent and conclusive evidence of a publication in the county of Bristol. In this respect the case is like that of *Rex* v. *Burdett*, 4 Barn. & Ald. 95.[1]

As to that part of the instructions of the judge, which states that the malicious intent charged in the indictment (there being no evidence admitted to prove the truth of the facts alleged) was an inference of law, — this is certainly the common law doctrine, and it never has been repealed by any statute of this commonwealth, nor overruled by any decision of this Court ; and if the doctrine be true, that the gist or essence of the offence of libel is, that it tends to provoke a breach of the peace, and this certainly is maintained in all the books, then it must follow, that when the publication complained of is of a libellous nature, it must be taken to be of a malicious character, unless the defendant shall within some of the known provisions of law be admitted to prove, and shall in fact prove, that the allegations made are true, and that he had some warrantable purpose, inconsistent with a malicious intent, in causing the publication.[2]

There are certain cases in which the defendant in a prosecution for a libel may acquit himself by showing an honest purpose and proving the truth of his allegations. The general principles upon which such a right depends, are stated in the case of *Commonwealth* v. *Clap*, 4 Mass. R. 168 ; though without doubt there are cases, other than those mentioned in

---

[1] See 1 Russell on Crimes, 240 ; Roscoe's Dig. Crim. Ev. 537 , 2 Stark Ev. (5th Amer. ed ) 455, 456; 3 Chitty on Crim. Law, (3d Amer. ed.) 872.

[2] See *Root* v. *King*, 7 Cowen, 613 ; *Dexter* v *Spear*, 4 Mason, 115 ; 3 Chitty on Crim. Law, (3d Amer. ed.) 867, 868, 875 ; 2 Stark. Ev. (5th Amer. ed.) 461 ; Roscoe's Dig. Crim. Ev. 536 ; 1 Russell on Crimes, 242, 243, *Erwin* v *Sumrow*, 1 Hawks, 472.

tne opinion of the Court in that case as illustrations of the general doctrine, in which the same principles will apply.

The law as laid down in the case above cited, has stood before the public nearly twenty years, and successive legislatures must be presumed to have acquiesced in its wisdom and policy, or it would have been altered by statute.

The general principle decided is, that it is immaterial to the character of a libel *as a public offence,* whether the matter of it be true or false ; not, as some have affirmed, because the law makes no distinction between truth and falsehood, but because the interest of the public requires, that men not invested with authority by the laws, shall not usurp the power of public accusation, and arraign before the public, with malicious motives, their neighbours and fellow citizens, exposing them to partial trials in forms not warranted by the constitution or laws, and condemning them to a species of ignominy which is often a heavier punishment than the law would inflict for the offences or misconduct of which they are thus officiously accused.   And surely so long as preventive justice shall be deemed more salutary than vindictive, all wise governments will hold it necessary to curb the disposition, always too prevalent, to excite ill temper and ill blood by exposing the offences, faults or foibles of men, who, if guilty of any violation of law, are amenable to punishment in the ordinary way, and if liable to censure for private vices, irregularities of temper or unaccommodating manners, should be left, as the law leaves them, to the corrections of conscience and those silent but powerful punishments which their misconduct itself will supply.

No state of society would be more deplorable than that which would admit an indiscriminate right in every citizen to arraign the conduct of every other, before the public, in newspapers, handbills or other modes of publication, not only for crimes, but for faults, foibles, deformities of mind or person, even admitting all such allegations to be true.   When the accusation is made by public bodies or officers whose duty it is by law to detect and prosecute offences, the charge and the investigation are submitted to, and no spirit of revenge is produced ; but if private intermeddlers, assuming the character of reformers, should have the right to become public accusers,

**313**

and when called to account, to defend themselves by breaking into the circle of friends, families, children and domestics, to prove the existence of errors or faults which may have been overlooked or forgiven where they were most injurious, the man who is thus accused without lawful process might be expected to avenge himself by unlawful means, and duels or assassinations would be the common occurrences of the times. Instances are recollected where violence, and even death, has ensued from such proceedings. It was with a wise regard to these evils, that the common law has put a check upon the *licentiousness* of the press, and the expression of opinion by writing, painting, &c. when the effect and object is to blacken the character of any one, or to disturb his comfort, the public good not being the end and purpose of such publication, or if that is professed, the public peace requiring a different mode of accusation.

Nor does our constitution or declaration of rights abrogate the common law in this respect, as some have insisted. The 16th article declares, that "the liberty of the press is essential to the security of freedom in a state ; it ought not, therefore, to be restrained in this commonwealth." The *liberty* of the press, not its *licentiousness ;* this is the construction which a just regard to the other parts of that instrument, and to the wisdom of those who formed it, requires. In the 11th article it is declared, that every "subject of the commonwealth ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which he may receive in his person, property or *character.*" And thus the general declaration in the 16th article is qualified. Besides, it is well understood, and received as a commentary on this provision for the liberty of the press, that it was intended to prevent all such *previous restraints* upon publications as had been practised by other governments, and in early times here, to stifle the efforts of patriots towards enlightening their fellow subjects upon their rights and the duties of rulers. The liberty of the press was to be unrestrained, but he who used it was to be responsible in case of its abuse ; like the right to keep fire arms, which does not protect him who uses them for annoyance or destruction.[1]

---

[1] *Dexter* v. *Spear*, 4 Mason, 115.

The common law therefore is left unimpaired by the con-
stitution, except as will hereafter be stated, and by that law,
unquestionably, the propagator of written or printed tales to
the essential prejudice of any one. in his estate or reputation,
is a public offender, and is not allowed to excuse himself by
the additional wrong of proving in a court of justice, in a col-
lateral way, the facts which he has unwarrantably promulgated.[2]

And yet there are some exceptions to this general rule,
recognised by the common law ; and others, which are ren-
dered necessary by the principles of our government.

These exceptions are all founded in regard to certain pub
lic interests, which are of more importance than the character
or tranquillity of any individual.  All proceedings in legislative
assemblies, whether by speech, written documents or otherwise,
are protected from scrutiny elsewhere than in those bodies
themselves, because it is essential to the maintenance of public
liberty, that in such assemblies the tongue and the press should
be wholly unshackled.  So proceedings in courts of justice,
in which the reputation of individuals may be involved, are to
be free from future animadversions, because the investigation of
right demands the utmost latitude of inquiry, and men ought not to
be deterred from prosecuting or defending there by fear of pun-
ishment or damages.  Yet in *these* instances, if this necessary
indulgence is abused for malicious purposes, a pretence only
being made of the forms of legislative or judicial process, the
party so conducting himself is amenable to the law.  The
right also of complaining to any public constituted body, of the
malversation or oppressive conduct of any of its officers or
agents, with a view to redress for actual wrong, or the removal
of an unfaithful officer, may be justified, because the case will     315
show that the proceeding does not arise from malicious motives,
or if it does, because the common interest requires that such
representations should be free.  And there are cases of mere
private import, such as an honest though mistaken character of
a servant, which, when requested by any one having an interest,
the law considers innocent.  These cases are all provided for

[2] See Roscoe's Dig. Crim. Ev. (Amer. ed.) 539, n. 1 ; 2 Stark. Ev. (5th
Amer. ed.) 472 ; 1 Russell on Crimes, 211 ; 3 Chitty on Crim. Law, (3d
Amer. ed.) 866, and notes.

Common-
wealth
*v.*
B.anding.

by the common law, and they go far to render harmless that much decried rule, that the truth is no defence in a prosecution for libel. *Rex* v. *Wright*, 8 T. R. 293 ; *Rex* v. *Creevey*, 1 Maule & Selw. 273 ; *Lake* v. *King*, 1 Saund. 131 ; *Astley* v. *Younge*, 2 Burr. 807 ; *Rogers* v. *Clifton*, 3 Bos. & Pul. 587 ; Esp. Dig. (3d ed.) 505 ; *Thorn* v. *Blanchard*, 5 Johns. R. 508 ; *Rex* v. *Fisher*, 2 Campb. 563 ; Starkie on Slander, *c.* 11.

That by the common law always, so far as it can be traced back, the doctrine as now mentioned in regard to excluding the truth of the matters alleged, as a defence in a public prosecution for libel, with the exceptions stated, has been recog nised and enforced, will be denied by no lawyer who has thoroughly examined the subject. *De Libellis Famosis*, 5 Co. 125 ; 4 Bl. Com. 150. Indeed it has always been objected as one of the imperfections of that system, by those who have chosen to question its title to veneration. But like most other principles of the common law, it is founded in common sense and common justice, and is not peculiar to that system, for it prevails in the civil law, and indeed the code of no civilized country would repudiate it. It may be altered, or, as may be thought, mitigated by legislative enactments in some States, but this very legislative interference is grounded upon the existence of the principle at common law. If any reformation therefore is wanted, which under the judicial expositions in this commonwealth may well be doubted, none but the legislature is competent to make it.[1]

---

[1] Immediately after this decision the legislature enacted, that in every prosecution for writing or for publishing a libel, the defendant may give in evidence in his defence, upon the trial, the truth of the matter contained in the publication charged as libellous, provided that such evidence shall not be deemed a sufficient justification, unless it shall be further made to appear, on the trial, that the matter charged to be libellous was published with good motives and for justifiable ends. *St.* 1826, *c.* 107, § 1 ; [Revised Stat. *c.* 133, § 6.]

So in Connecticut, New York and some other of the States, the truth of the supposed libellous matter may be given in evidence in public prosecutions, by virtue of the constitutions of some, and the statutes of others, made for that purpose, subject to different degrees of limitation. See constitution of New York, Art. 7, § 8 ; 1 Revised Stat. of New York, 94 ; 1 Russell on Crimes, 209, n. *A* ; 2 Stark. Evid. (5th Amer. ed.) 472, n. (1).

For a very sensible, learned and manly discussion of this subject, I refer to the opinion of the Court of Appeals in South Carolina, delivered by *Waties* J. in the case of *The State* v. *Lehre*, published in 4 Hall's Law Journ. 48. The doctrine so laid dow¹ had the sanction of the intelligent bar of the State.

The truth is, that the rule, with the exceptions stated, has never been complained of, except when applied to prosecutions for libel of political bearing and character. In such prosecutions the passions of men are always much inflamed, and there is a desire on one side or the other to break through those wholesome restraints which the law has devised for the protection of private character and the preservation of the public peace. An attack upon public men, even in regard to their private characters, has been viewed as a right growing out of our free institutions and essential to the support of them. And so far forth as this notion is correct and salutary, it has been incorporated into our law, and serves to form an exception to the general rule, not distinctly admitted by the common law, though not at all inconsistent with its general character. The case of *Commonwealth v. Clap* was the first, since the adoption of the constitution, which called for a discussion of these principles, and in that case it is very clearly and distinctly settled, that if the *truth only* is told of public elective officers, or of acknowledged candidates for offices, in a decent manner and with a view properly to influence an election, it is justifiable.[1] For the reasons upon which that doctrine is founded, we refer to the case above cited. The force of them will not be disputed.

But there are certain other cases not yet distinctly adjudicated upon, where the truth of charges is a legitimate ground of defence, by clear inference from principles recognised by the common law and our own tribunals.

In *Commonwealth* v. *Clap*, it is stated, "that a man may apply by complaint to the legislature to remove an unworthy

---

[1] See *King* v. *Root*, 4 Wendell, 113; *Thomas* v. *Crosswell*, 7 Johns. R. 264, 3 Chitty on Crim. Law (3d Amer. ed.) 868, notes.

Common-
wealth
*v.*
Blanding

officer ; and if the complaint be true, and made with the honest intention of giving useful information, and not maliciously, or with intent to defame, the complaint will not be a libel "

This is put for illustration of the principle, not to exhibit the only instance in which it is to be applied. A complaint to the *executive* against an officer holding his place at its pleasure, — to a court against an officer whom they have the power to dismiss, — to any body of men having power over its officers, — the subject of the complaint being of a public nature, or the person complaining having a particular interest in it, — *falls within the same principle*

Thus if a minister of the gospel should be guilty of gross immoralities, and one of his parish should complain to the church in order that an inquiry might be instituted ; or if a *candidate* for the ministry should from vicious habits be unfit for the station he seeks ; since all are interested in the purity of the ministerial character, information to those whose duty it is to determine his qualifications, would not be libellous, if communicated in a spirit of truth and candor. Various other cases might be put, in which if it appeared that the purpose was sincere and upright, and wholly free from malice, the truth of the facts stated would be a good defence. But in all such cases, the information is to be given to those who have a right to act upon it, and whose interest and duty are concerned in it ;[2] for a promiscuous promulgation of the same facts would of itself be the strongest evidence of malice, and in such cases the court must judge whether the occasion is a fit and proper one for the admission of such defence, and the jury must determine the motives and the end.

With this exposition of the law of libel in this common wealth, in which we are warranted by the common law, by the constitution, and by judicial decisions, there seems to be no reason for complaint against that general rule, which is so often the theme of popular declamation. A further relaxation can scarcely take place without involving the community, fam-

---

[1] 3 Chitty on Crim. Law, (3d Amer. ed.) 870, notes ; Roscoe's Dig Crim Ev. 538 to 540; 1 Russell on Crimes, 231, 232.

[2] See *Remington* v. *Congdon*, 2 Pick. (2d ed.) 315, n. 1.

lies and individuals, in those contentions and acrimonious conflicts which will render the social state little, if at all, better than the savage.

The principal difference between the common law, as admitted here, and the statute provisions of the State of New York, is, that *there* the jury are to judge of the occasion, as well as the motives and ends of the publication ; whereas, with us, it must appear first to the court that the case is a proper one for the admission of the truth in evidence. The difficulty with the New York system is, that in every prosecution for a libel, whether of a public or a private nature, the whole matter must be made the subject of open investigation ; so that a man's whole domestic relations may be brought before the public, in order to ascertain whether the motives of the alleged libeller were good and his end justifiable ; whereas our system proceeds on the ground that private individuals have nothing to do with the conduct of their neighbours, as it may affect the public, unless they proceed in due course of legal process against them in some tribunal, where, instead of being crushed by public opinion factitiously made up on newspaper paragraphs, they will have full opportunity to vindicate their innocence, or if guilty, meet only the punishment which the law has awarded for their offence. If the public sentiment in this commonwealth is in favor of a more relaxed system, the power is in the hands of the legislature, which can mould the law at its pleasure.

318

Having thus attempted to vindicate the law of libel, as established in this commonwealth, from the aspersions which are frequently cast upon it, we will consider its application to the case before us, in order to determine whether, upon either of the grounds assumed, a new trial ought to be granted.

The first ground, to wit, the want of legal proof that the libel was published, as alleged, within the county of Bristol, has been considered and overruled ; as has also the objection to the charge to the jury.

The other objection, which opens the general question, is that the judge refused to admit in evidence the inquisition which is alluded to in the publication, and with a view to prove the truth of the facts therein stated. Had the inquisition been

published without any defamatory comment, it certainly would not have furnished ground for this prosecution ; for it does not of itself contain any libellous matter, and it is in the nature of a judicial inquiry, the publication of which would not be crim inal, unaccompanied by direct proof of malice. The inquisi tion merely states that a deceased stranger, who was found dead in a tavern kept by Fowler, came to his death by intox- ication. Now this may be true, without any implication against Fowler, for every innholder is liable to have drunken people come to his house, and if they die there, he may be entirely innocent of the cause of their death. But the remarks made by the defendant charge Fowler with having administered the *liquid poison,* and thus being the cause of the death of the stranger ; and the public are warned against resorting to the house where such practice is allowed, and the municipal author- ities are invoked to exert their power by taking away or with- holding the license of Fowler to keep a public house. The matter of this publication is certainly libellous, as it insinuates gross misconduct against Fowler, and directly charges him with a violation of his duty, and exposes him to the loss of his livelihood, so far as that depends upon the reputation of his inn for regularity and order. Admitting the account of the inqui- sition to be correct as published, yet the addition of comments and insinuations tending to asperse Fowler's character renders it libellous. *Thomas* v. *Croswell,* 7 Johns. R. 264.[1]

But it is said, that this is a matter of public concern, and that the defendant was impelled by a sense of public duty to warn travellers and others from a house which was thus deserv- edly stigmatized. The answer is, that the defendant did not select a proper vehicle for the communication. The natural effect of a publication of this sort in a newspaper, is, to pro cure a condemnation in the public mind of the party accused, and his punishment, by bringing his house into disrepute, with out any opportunity of defence on his part ; so that tne accuser

---

[1] Roscoe's Dig. Crim. Ev. (Amer. ed.) 540, and note; 3 Chitty on Crim. Law, (3d Amer. ed.) 870, notes ; *Clark* v. *Binney,* 2 Pick. (2nd ed.) 113, 117, n. 2 ; *Flint* v. *Pike,* 4 Barn. & Cressw. 473 ; *Roberts* v. *Brown,* 10 Bingh. 519; *Saunders* v. *Mills,* 6 Bingh. 213; *State* v. *Lehre,* 2 Constitutional Rep. 809, 819; *Heyward* v. *Cuthbert,* 4 M·Cord, 354

becomes judge and executioner at one stroke, and his purpose, if a malicious one, is answered, without any means of relief; for the mischief to the person libelled would be quite as great if he were innocent as if he were guilty. If it should be said in answer, that all this is right if the allegation be true, and if not true, he may recover his damages in an action of slander, it may justly be replied, that this remedy is uncertain and incomplete ; for in many cases the slanderer will be unable to respond in damages, and the suffering party will be subjected to the additional injury of a troublesome and expensive lawsuit with little or no hope of recompense.

There may be cases where (there being no other mode by which great mischief can be warded off from the public) a newspaper communication, made with the sole view of preserving the citizens from injury to their life or health, would be justifiable. Such might be the case of an apothecary selling and distributing poison in the form of medicine, stated by a distinguished member of the late convention for revising the constitution. This is an extreme case, where to delay information until the forms of law should be pursued might endanger the lives of hundreds, and such a case would be a law to itself; the public safety being the supreme law, and it being every citizen's duty to give warning in such cases. There may be cases of gross swindling, where nothing but immediate notice would secure the public against depredation, which would be governed by the same principle.

But in the case before us there was no such urgent necessity. The statute regulating licensed houses provides the restrictions and the punishment which the legislature has thought adequate to the offences of the nature contained in this libel. For suffering excessive drinking in his house, the innkeeper is subject to a penalty. For a second offence, he is to be put under bond for good behaviour, in addition to a pecuniary mulct. For a third, he is to forfeit his license and shall be disqualified to keep a public house for two years. And besides all this, if his misconduct is continued, so as to constitute his house disorderly, or so that he violates the law for regulating it, he forfeits the penalty of his recognizance. Other guards and securities are provided in the statute, to pre-

Common wealth
v.
Blanding.

**320**

Common-
wealth
*v.*
Blanding.

vent the abuse of the license, and a compiant may be made to the selectmen, to a justice of the peace, or to a grand jury, by any person who has knowledge of such offences, without incurring the risk of a prosecution for libel. There was then no necessity for this newspaper publication, and the defendant, by resorting to it, has taken the law into his own hands unwarrantably, instead of resorting to those tribunals which the laws have constituted for the correction of these offences. This then is a case in which the defendant cannot be allowed to excuse himself by showing the truth of the accusation which he has unjustifiably made. He had no right to arraign the prosecutor before the public in the form which he adopted, and thus destroy the reputation of his house, without leaving him any means of showing his innocence of the charges made against him. The occasion was not a proper one for a newspaper denunciation.

*Motion for new trial overruled*