FUCHS et al., Appellants,

v.

SCRIPPS HOWARD BROADCASTING COMPANY et al., Appellees, et al.

[Cite as *Fuchs v. Scripps Howard Broadcasting Co.*, 170 Ohio App.3d 679, 2006-Ohio-5349.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–050166.

Decided Oct. 13, 2006.

680

Keating Muething & Klekamp, P.L.L., Richard L. Creighton Jr., William A. Posey, Matthew K. Buck, and Jason M. Cohen, for appellants.

Wood & Lamping, L.L.P., and Peter M. Burrell, for appellees Penelope Orr, Steve Francis, and Rebecca Benoit.

Frost Brown Todd, L.L.C., Richard M. Goehler, Jill Meyer Vollman, and Monica L. Dias, for appellees Scripps Howard Broadcasting Company, d.b.a. WCPO–TV, William Fee, Robert Morford, and Hagit Limor.

MARK P. PAINTER, Judge.

{¶ 1} The media has great freedom in this country because we value its watchdog role. Yet the public's right to know must be balanced by an individual's privacy interests—and it is where these intersect that the courts must be careful to balance both interests.

{¶ 2} Here, a TV station did investigative reporting. It was sued for defamation. We hold that the trial court was correct in granting summary judgment to the station because it acted reasonably.

## I. The Investigation

{¶ 3} Plaintiff-appellant J. Michael Fuchs, D.D.S., Inc., d.b.a. Family Dental Care Associates ("FDCA"), has one of the largest dental practices in the Cincinnati area. FDCA has approximately 200,000 patient records in 125,000 separate accounts and generates 60,000 patient visits per year at five locations. J. Michael Fuchs is the president, CEO, sole shareholder, and sole officer of FDCA. Fuchs controls all aspects of FDCA's business, including billing practices, patient care, customer service, hiring and firing, employee training, and compliance with state and federal regulations.

{¶ 4} Defendant-appellee Hagit Limor is a reporter for defendant-appellee Scripps Howard Broadcasting Company, d.b.a. WCPO–TV's ("WCPO"), in its consumer and citizen advocacy investigational series, the I–Team. WCPO's consumer reporter, John Matarese, forwarded to Limor complaints from defendants-appellees Steve Francis and Rebecca Benoit about FDCA. Matarese also forwarded to Limor a videotaped interview with Francis. Limor began to investigate the complaints—which concerned billing problems and the inability of Francis and Benoit to reach FDCA to resolve the problems because of busy signals and full voice-mail boxes at FDCA's corporate headquarters. Limor followed up on the complaints by contacting Francis and viewing his videotaped interview.

{¶ 5} Following these preliminary steps, in December 2002, Limor tried to contact Fuchs for comment, but she was also met with unanswered phone calls and full voice-mail boxes. Limor contacted the Ohio State Dental Board, but she was told that the board dealt only with clinical issues and did not keep open public records. The board directed Limor to the Ohio Attorney General's Office ("AG"), which dealt with billing complaints. Limor spoke by phone with the AG's public-relations representative, Peter Gribbon. Later, Limor conducted a videotaped interview with Gribbon, who stated that the AG had received an "unusual" number of complaints about FDCA but was unable to say how many of the

complaints were valid. Gribbon also stated that the AG was not currently investigating FDCA's billing practices.

{¶ 6} Limor contacted the Cincinnati Better Business Bureau ("BBB") and spoke to its president, Jocile Ehrlich. The BBB had well over 100 unresolved complaints against FDCA, which had an unsatisfactory rating. Ehrlich later stated that the complaints were mainly about billing issues. Limor videotaped interviews with Ehrlich, Francis, Benoit, and the Kutcheras, a married couple who had complained to the BBB about FDCA's billing practices.

{¶ 7} Limor continued to investigate FDCA. She discovered that FDCA was involved in more than 180 lawsuits in Hamilton County. When Limor spoke to some of the people involved in the lawsuits, she heard more complaints about FDCA's billing practices and customer service. Limor also spoke to two dentists not affiliated with FDCA about their own billing practices.

{¶ 8} Limor tried to contact Fuchs for his response. Fuchs telephoned Limor on February 4, 2003, and stated that he did not "double-bill" his patients. Fuchs told Limor that neither she nor the complaining patients understood dental insurance. Fuchs stated that when he told Limor to speak to insurance companies about dental billing, Limor told him that she "didn't have to." Limor denied making that statement. Fuchs directed Limor to obtain releases from the patients if she wanted to inspect the relevant patient records.

{¶ 9} Limor obtained releases from Francis, Benoit, and the Kutcheras and took them to FDCA's corporate office. Hoping to get an on-camera interview with Fuchs, Limor brought her videographer, Rod Griola. Fuchs refused to appear on camera. Fuchs also refused to release the relevant patient records, even though Limor had obtained the requested releases.

{¶ 10} Fuchs wrote a series of letters to Limor and WCPO, stating that the "charges" they were making were false, threatening legal action, and requesting the opportunity to respond to the "allegations" in a list of written interrogatories. Limor refused to send written questions to Fuchs on the advice of defendants-appellees Robert Morford, WCPO's news director, and William Fee, WCPO's general manager. Morford and Fee denied Fuchs's request for written questions because they preferred face-to-face interviews for the visual medium of television and because they could not be sure of the identity of the person who would actually answer the written questions.

{¶ 11} Limor made two more attempts to interview Fuchs or a representative of FDCA. The first attempt was early one morning when Limor and Griola showed up uninvited at Fuchs's home. Fuchs would not appear on camera. The second attempt resulted in a meeting between Fuchs's attorney and representatives of WCPO. Fuchs did not attend the meeting. Fuchs's attorney refused to

speak on the record. And rather than addressing the issues raised by WCPO, he merely related his own experiences with dentists and the basic standards of dental-billing practices.

## II. The First Broadcast

{¶ 12} After about three months of investigation, WCPO aired its first I–Team report about FDCA on WCPO's February 24, 2003, 11 p.m. newscast.

{¶ 13} In the broadcast report, Francis, Benoit, and the Kutcheras complained that they did not understand the amounts that FDCA had billed them, because the bills did not match the patient portions that their insurance companies had specified and because the bills did not reflect the dental treatment that they had requested. The patients also talked about the substantial difficulty they had met in trying to contact FDCA to resolve the billing issues. Benoit stated that her account had been turned over to a collection agency by FDCA for an amount that she did not owe. Limor reported that FDCA had an unsatisfactory rating with the BBB, with 125 complaints, "the vast majority over billing disputes." Jocile Ehrlich stated that the 125 BBB complaints represented an "extremely high number" and that the average number of complaints about a dental firm was "none, one maybe." Limor reported that Fuchs had stated that the problem was that "patients don't necessarily understand their insurance."

## III. The Second Broadcast—and the Response

{¶ 14} Following the first FDCA broadcast, WCPO received more than 90 telephone calls and e-mails from patients and former employees of FDCA supporting the claims made in the broadcast. As a result, WCPO aired a second FDCA report on February 25, 2003. The second broadcast was a short update reporting the more than 90 calls and e-mails that WCPO had received in support of the first broadcast. The second broadcast also contained a statement by Peter Gribbon that the AG had received approximately 30 complaints about FDCA's billing practices and that "the number of complaints [the AG had received was] a little bit out of the ordinary." The broadcast contained a telephone number for contacting the AG with complaints. The report also stated that the current number of complaints the BBB had received about FDCA was 135.

{¶ 15} Fuchs and FDCA began to receive negative comments from patients who had seen WCPO's broadcasts. To defend his integrity and to attack Limor and WCPO, Fuchs paid $18,500 for a full-page advertisement in the Sunday, March 23, 2003 Cincinnati Enquirer, denying the allegations. The advertisement stated that Fuchs had asked Limor and WCPO to contact insurance companies to verify that FDCA's billing practices were "well within the norm" but that Limor had responded, "I don't have to." The ad also stated that FDCA's "billing

procedures [had] been reviewed by the Ohio State Dental Board and found to be within standard practice."

### IV. But They Buy Videotape by the Case

{¶ 16} In response to FDCA's advertisement, WCPO reran the February 24, 2003 broadcast on March 23, 2003. During the March 23 broadcast, WCPO made several statements defending the investigation. Limor stated that WCPO had heard from "more than a hundred unhappy patients and eight former employees" of FDCA, confirming the claims made in the I–Team broadcasts. Limor reported that Fuchs stated that he had resolved some of the BBB complaints without the BBB's knowledge. Limor also reported that the BBB had received 44 new complaints about FDCA, bringing the total to 169. Limor also announced a follow-up report to air later that week raising new issues such as safety, cleanliness, refusing to treat patients unless they paid first, and ordering unnecessary treatment.

{¶ 17} Following the FDCA broadcasts, WCPO received almost 200 responses from former patients and employees asserting more complaints about FDCA's business practices and patient care. The patient-care complaints were the center of WCPO's March 26, 2003 broadcast, which reminded viewers with stand-alone graphics about the original complaints that included "double billing." Limor conducted a group interview with former patients who had tried to resolve various issues with FDCA.

{¶ 18} The patients complained about unresolved billing problems, poor customer service, "filthy" dental offices and equipment, FDCA's refusal to treat patients without a payment first, and FDCA's dentists prescribing unnecessary treatment. The broadcast included statements from former FDCA employees that confirmed the patients' complaints. The former employees also raised questions about FDCA's dental equipment and Fuchs's alleged prior knowledge of the State Dental Board's inspections.

{¶ 19} Because Fuchs refused to comment on camera, Limor read portions of a letter Fuchs had faxed to WCPO in which he denied all allegations and stated that (1) FDCA's offices were clean, safe, and fully compliant with "all dental standards," (2) FDCA did not order unnecessary care, and (3) FDCA directed all its efforts toward providing patients "with quality care at a reasonable fee in a comfortable and caring manner."

{¶ 20} On June 1, 2003, WCPO aired a fifth I–Team report about sterilization and cleanliness issues at FDCA. The June 1 broadcast focused on the board's role in policing complaints against FDCA and its dental practices.

{¶ 21} Statements by former patients and defendant-appellee Penelope Orr, a former FDCA office manager, were included in the broadcast. Orr stated that

FDCA dentists had not had the time to adequately sterilize equipment between patients and that the "only thing" separating a patient and "somebody else's germ [was] a quick spray of Lysol and a paper towel." Orr said that she had tried to report FDCA to the board and the AG, but nothing was resolved. Two former FDCA dentists, their identities hidden, described unsanitary dental practices they had engaged in while employed at FDCA. They described inadequate infection control and sterilization, poor-quality dental work, and generally poor patient care. The dentists also stated that Fuchs had received word ahead of time about the board's inspections. The board disputed that claim, denying any special relationship with Fuchs. The broadcast also included a statement by Gribbon that the AG was looking into 60 complaints it had received about FDCA.

## V. Fuchs and FDCA Sue—and Lose

{¶ 22} On August 8, 2003, Fuchs and FDCA filed this case against various former patients and employees for defamation in the I–Team reports. Then WCPO, Fee, Morford, and Limor moved to intervene.

{¶ 23} WCPO aired another report on August 28, 2003, describing the lawsuit. The report included statements by Francis, Benoit, and several other defendants responding to the lawsuit. All the defendants stood by their previous statements about FDCA. The broadcast also described WCPO's efforts to intervene in the lawsuit to defend its I–Team reporting.

{¶ 24} The trial court granted the motion to intervene. On the October 3, 2003 newscast, WCPO noted that it had been allowed to intervene in the lawsuit. FDCA filed an amended complaint on October 9, 2003, including the WCPO defendants. Francis, Benoit, Orr, WCPO, Fee, Morford, and Limor moved for summary judgment, which the trial court granted. Fuchs and FDCA then voluntarily dismissed all other defendants.

## VI. Fuchs and FDCA Appeal

{¶ 25} Fuchs and FDCA have appealed, raising one assignment of error, alleging that the trial court erred in granting summary judgment.

{¶ 26} Summary judgment is proper under Civ.R. 56(C) when (1) no genuine issue of material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and with the evidence viewed most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.[1] Appellate review of the trial court's decision to grant summary judgment is de novo.[2]

---

1. See *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 4 O.O.3d 466, 364 N.E.2d 267.

■ {¶ 27} Summary judgment is appropriate in defamation actions because whether words are defamatory is a question of law.[3] And it is especially appropriate in cases involving First Amendment free-speech issues.[4]

## VII. Defamation—Public Figure or Not?

■ {¶ 28} Defamation is the publication or communication of a false statement of fact that injures someone by adversely affecting the person's (1) reputation, (2) business, or (3) position—by exposure to public hatred, contempt, ridicule, shame, or disgrace.[5] The essential elements of a claim for defamation are that (1) the defendant made a false statement, (2) that false statement was defamatory in the sense that it reflected unfavorably on the plaintiff's character or injured his trade or business, (3) the statement was published or communicated, and (4) the defendant acted with the necessary degree of fault.[6]

■ {¶ 29} A defamation plaintiff can be one of four types: (1) a private person, (2) a public official, (3) a public figure, or (4) a limited-purpose public figure.[7] Classification determines the plaintiff's burden of proof.[8] And a plaintiff's classification is a matter of law for the court to decide.[9]

■ {¶ 30} Public officials, public figures, and limited-purpose public figures must show that the challenged statements were made with actual malice, that is, with knowledge that the statements were false or with reckless disregard of whether they were false.[10] In cases involving the defamation of private persons,

2. See *Doe v. Shaffer* (2000), 90 Ohio St.3d 388, 738 N.E.2d 1243; *Jorg v. Cincinnati Black United Front*, 153 Ohio App.3d 258, 2003-Ohio-3668, 792 N.E.2d 781.

3. See *Vail v. Plain Dealer Publishing Co.* (1995), 72 Ohio St.3d 279, 649 N.E.2d 182.

4. See *Perez v. Scripps–Howard Broadcasting Co.* (1988), 35 Ohio St.3d 215, 520 N.E.2d 198.

5. See *Murray v. Knight–Ridder, Inc.*, 7th Dist. No. 02 BE 45, 2004-Ohio-821, 2004 WL 333250; *Holley v. WBNS 10TV, Inc.*, 149 Ohio App.3d 22, 2002-Ohio-4315, 775 N.E.2d 579.

6. See *Baby Tenda of Greater Cincinnati, Inc. v. Jessup* (Mar. 16, 1988), 1st Dist. Nos. C–870158 and C–870397, 1988 WL 32092; *Hersch v. E.W. Scripps Co.* (1981), 3 Ohio App.3d 367, 3 OBR 430, 445 N.E.2d 670.

7. See *Talley v. WHIO TV–7* (1998), 131 Ohio App.3d 164, 722 N.E.2d 103.

8. See id.

9. See *Daubenmire v. Sommers*, 156 Ohio App.3d 322, 2004-Ohio-914, 805 N.E.2d 571.

10. See id.

an ordinary negligence standard is applied.[11] Private-person defamation plaintiffs must show by clear and convincing evidence that the defendant failed to act reasonably in attempting to discover the truth or falsity or defamatory character of the publication.[12]

### VIII. *The Fight Doesn't Start When They Hit Back*

{¶ 31} The trial court held that Fuchs and FDCA were private-person plaintiffs for the broadcasts that occurred before March 23, 2003, when the advertisement appeared in the Cincinnati Enquirer. But the trial court held that by taking out the advertisement, Fuchs and FDCA had injected themselves into the controversy. Therefore, the trial court held, Fuchs and FDCA were limited-purpose public figures for the broadcasts that appeared after March 23. In this decision, the trial court was mistaken.

{¶ 32} The decision whether a plaintiff is a limited-purpose public figure or a private person must be made on a case-by-case basis by considering all the relevant facts and circumstances.[13]

{¶ 33} Limited-purpose public figures are those who have become public figures for a specific range of issues.[14] A private person may become a limited-purpose public figure if he "voluntarily injects himself or is drawn into a particular public controversy." [15] A court should decide whether a person is a limited-purpose public figure by examining the person's "participation in the controversy from which the alleged defamation arose, and whether he has attained a general notoriety in the community by reason of that participation." [16]

{¶ 34} But "[a] plaintiff does not become a public figure merely because the allegedly defamatory statements create a controversy; the controversy must have existed prior to the statements." [17]

---

11. See *Lansdowne v. Beacon Journal Publishing Co.* (1987), 32 Ohio St.3d 176, 512 N.E.2d 979.

12. See id.; *Baby Tenda of Greater Cincinnati, Inc. v. Taft Broadcasting Co.* (1989), 63 Ohio App.3d 550, 579 N.E.2d 522.

13. *Worldnet Software Co. v. Gannett Satellite Information Network, Inc.* (1997), 122 Ohio App.3d 499, 702 N.E.2d 149.

14. See *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789.

15. Id.

16. *Talley v. WHIO TV–7*, supra note 7; see *Total Exposure.com., Ltd. v. Miami Valley Broadcasting, Corp.*, 2nd Dist. No. 21062, 2006-Ohio-484, 2006 WL 267151.

17. *Worldnet Software Co. v. Gannett Satellite Information Network, Inc.*, supra note 13.

{¶ 35} And the alleged defamers cannot, by provoking a response to an attack, make the subject of the statements—the one attacked—a public figure simply because the attacked person responds. "Clearly, those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." [18] That is, they can't say, "It started when he hit me back."

{¶ 36} We hold that Fuchs and FDCA did not voluntarily inject themselves into a public controversy by placing the defensive advertisement in the Cincinnati Enquirer. Fuchs and FDCA were drawn into a public controversy that had been created, for the most part, by the I–Team reports. We hold that Fuchs and FDCA held the status of private-person plaintiffs for the entire series of broadcasts. This is not to say that in another case, with different facts, placing ads or replying to charges could not rise to a level to change a private person to a public figure. But not here.

## IX. Summary Judgment

{¶ 37} Because the facts were undisputed—no one contests what was said— summary judgment was the proper vehicle to resolve this defamation case. To withstand the motions for summary judgment, Fuchs and FDCA, as private-person plaintiffs, had to show that statements were false and that the defendants did not act reasonably in attempting to discover the truth or falsity of the publications. For the summary judgment to be valid, the trial court had to hold—and this court must agree—that no reasonable jury could have so found. It did and we do.

{¶ 38} Fuchs and FDCA alleged that Francis defamed them by stating: (1) "They [FDCA] billed my insurance for the same thing they billed me for. In my heart I honestly think that's a way to get double paid" and (2) "This is not what happens accidentally. You don't have 125 accidents and that is just what the Better Business Bureau is aware of. It just doesn't seem right. And you know what's so funny is you think if there's that many people that complained, how many didn't." Benoit was alleged to have defamed Fuchs and FDCA by stating: (1) "They continued to bill me for monies that I did not owe" and (2) "They don't care about the customer or the patient. They care about their money."

{¶ 39} Statements of opinion are protected speech under the Ohio Constitution.[19] For a statement to be defamatory, it must be a statement of fact

---

**18.** *Hutchinson v. Proxmire* (1979), 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411; see *Gilbert v. WNIR 100 FM* (2001), 142 Ohio App.3d 725, 756 N.E.2d 1263.

**19.** See *Vail v. Plain Dealer Publishing* Co., supra note 3.

and not of opinion.[20] Whether the alleged defamatory statement is fact or opinion is a question of law.[21]

## X. Fact or Opinion?

 {¶ 40} A totality-of-the-circumstances test determines whether a statement is fact or opinion.[22] In applying that test, a court should consider the specific language used, whether the statement is verifiable, the general context of the statement, and the broader context in which the statement appears.[23] Application of the test is fluid, and the weight to be given any one factor will necessarily vary depending on the circumstances of each case.[24]

 {¶ 41} The meaning of an allegedly defamatory statement is the meaning a reasonable viewer would attach to the statement.[25] The question is whether a reasonable viewer would view the words used to be language that normally conveys factual information or merely hyperbole or opinion.[26] The court must consider whether the specific language is ambiguous or has a meaning that is readily ascertainable; and whether the purpose of the language is to elicit an emotional response.[27]

 {¶ 42} Troubleshooting investigations in a newscast, such as the I–Team reports, are generally regarded as fact rather than opinion.[28] Therefore, the general context in which the alleged defamatory statements appeared in this case was factual.

---

20. See id.

21. See *Wampler v. Higgins* (2001), 93 Ohio St.3d 111, 752 N.E.2d 962; *Yeager v. Local Union 20, Teamsters* (1983), 6 Ohio St.3d 369, 6 OBR 421, 453 N.E.2d 666.

22. See *Vail v. Plain Dealer Publishing Co.*, supra note 3; *Scott v. News–Herald* (1986), 25 Ohio St.3d 243, 25 OBR 302, 496 N.E.2d 699.

23. See id.

24. See *Jorg v. Cincinnati Black United Front*, supra note 2, citing *Vail v. Plain Dealer Publishing Co.*, supra note 3.

25. See *Jorg v. Cincinnati Black United Front*, supra note 2, citing *McKimm v. State Elections Comm.* (2000), 89 Ohio St.3d 139, 729 N.E.2d 364.

26. See *Worldnet Software Co. v. Gannett Satellite Information Network, Inc.*, supra note 13, citing *Vail v. Plain Dealer Publishing Co.*, supra note 3.

27. See id.

28. See id.

{¶ 43} Next, we must focus on the specific language used and the common meaning ascribed to the words by a reasonable viewer. A viewer is placed on notice by objective, cautionary terms, or "language of apparency," that what is being said is the opinion of the speaker.[29] Terms such as "in my opinion" or "I think" are highly suggestive of opinion.[30] That labeling strongly militates in favor of the statement as opinion.[31] In *Scott v. News–Herald,* the Ohio Supreme Court held that the language "knows in his heart" created the undeniable conclusion that a statement was one of opinion.[32]

{¶ 44} Under the *Scott* test, Francis's statement that "[i]n my heart I honestly think that's a way to get double paid" was protected opinion. Further, we hold that Francis's second statement was also protected opinion. The words "It just doesn't seem right" and "you know what's so funny" gave Francis's second statement an air of hyperbole and subjectivity. Francis's statement that "[t]his is not what happens accidentally" elicited an emotional response and was not readily verifiable. A reasonable viewer would have recognized that the statements were Francis's opinion.

{¶ 45} Francis's statement that "[t]hey billed my insurance company for the same thing they billed me for" was readily verifiable. Francis had firsthand knowledge about the facts underlying the statement. A reasonable viewer would have believed the statement to be factual in nature. Therefore, the statement was not protected opinion.

{¶ 46} Turning to Benoit, we hold that her statements that "[t]hey don't care about the customer or the patient," and that "[t]hey care about their money" were statements of protected opinion. The statements were made to elicit an emotional response, and they were not readily verifiable. A reasonable viewer would have believed that the statements reflected Benoit's opinion about her treatment by FDCA. No reasonable viewer would have believed that the statements were factual.

{¶ 47} But Benoit's statement "They continued to bill me for monies that I did not owe" was a statement of fact. It was readily verifiable, and a reasonable viewer would have believed that the statement was factual.

---

29. *Scott v. News–Herald* (1986), 25 Ohio St.3d 243, 252, 25 OBR 302, 496 N.E.2d 699.

30. See id.

31. See id.

32. See id at 253, 25 OBR 302, 496 N.E.2d 699.

## XI. *Truth Is a Defense—Francis and Benoit*

{¶ 48} Considering the two statements of fact, we must decide whether the statements were true. Though in early common law truth was not necessarily a defense, truth is now a complete defense to defamation.[33] Were Francis's statement that "[t]hey billed my insurance for the same thing they billed me for" and Benoit's statement that "[t]hey continued to bill me for monies that I did not owe" true?

{¶ 49} Francis and his wife went to FDCA for a standard cleaning and checkup. Francis understood that preventive dental services were fully covered under his insurance policy. FDCA employees verified Francis's insurance. After Francis and his wife had been treated, Francis was told that he had to pay FDCA a $100 "deductible." Francis paid the $100 and later attempted to contact FDCA for an explanation about why he had been made to pay a deductible when his insurance did not require a deductible for preventive dental services. Francis was unsuccessful in contacting FDCA. Humana, Francis's insurance company, agreed that FDCA "should not be collecting a deductible when preventive services are not subject to a deductible."

{¶ 50} Subsequently, Francis received a bill from FDCA for $92. Francis also received an "explanation of benefits" ("EOB") from his insurer, which described the insurance coverage and stated that FDCA had billed the insurance company. Francis's insurer ultimately covered all but $30 of FDCA's charge for the dental services. Eventually, it was determined that FDCA had overcharged Francis and his insurer. Francis received a refund check from FDCA for $70. Francis's insurer also received a refund from FDCA.

{¶ 51} We hold that Francis's statement was essentially true. We do not view the statement as an allegation of illegal behavior by FDCA. Rather, we view it as a straightforward statement from Francis about his experience at FDCA.

{¶ 52} Benoit received a series of dental treatments from FDCA from August through December 2000. Soon after her treatments began, FDCA started to bill Benoit for more than she thought she owed for the services. Benoit had great difficulty contacting FDCA to resolve her billing problem. She began to receive threatening collection letters from FDCA. In July 2001, Benoit went to FDCA's corporate office and demanded answers to her questions about the bills. During a conference call between Benoit, her insurer, and FDCA, it was determined that Benoit's insurance claim had been processed incorrectly.

---

33. See, e.g., *Commonwealth v. Blanding* (1825), 20 Mass. 304; *Murat Halstead & Co. v. Schempp* (1881), 8 Ohio Dec.Reprint [204] 271; *Ed Schory & Sons, Inc. v. Society Natl. Bank* (1996), 75 Ohio St.3d 433, 662 N.E.2d 1074.

FDCA promised that the billing problems would be solved and that Benoit would be removed from collection and sent a refund. Sometime later, Benoit received another collection letter. After an 18–month ordeal, Benoit finally received a refund check from FDCA, but the mark against her credit because of the erroneous collection was never removed from her credit record.

{¶ 53} We hold that Benoit's statement that she was billed for money that she did not owe was essentially true. Thus we hold that the trial court was correct in granting summary judgment in favor of Francis and Benoit.

## XII. Orr's Allegations

{¶ 54} We now turn to Penelope Orr's statements that FDCA's dentists had not had the time to adequately sterilize equipment between patients and that the "only thing" separating a patient and "somebody else's germ [was] a quick spray of Lysol and a paper towel." Orr's statements were based on information given to her by Stephanie Mays, a dental assistant in the FDCA office that Orr managed. Mays's job was to sterilize instruments between patients. Orr never personally saw Lysol sprayed on equipment or instruments that had not been properly sterilized and that had then been used on patients. Orr did not do any investigation on her own to verify Mays's statements.

{¶ 55} Assuming that there was a genuine issue of material fact about whether Orr's statements were true, we hold that Fuchs and FDCA failed to show by clear and convincing evidence that Orr did not act reasonably in attempting to discover the truth or falsity of the statements. There was no evidence to suggest that Orr had any reason to disbelieve Mays, whose job it was to sterilize instruments between patients. In addition, we point out that Orr's claims about inadequate sterilization were supported by other former FDCA employees and dentists. One former FDCA dentist stated, "When the office got very busy[,] the instruments would not sit for the prescribed time to achieve sterilization." Another former FDCA dentist stated, "[W]e utilized the Lysol spray and let it sit for ten minutes on a non-critical instrument * * * because there wasn't another one available, and so we had surface disinfection." We hold that the trial court was correct in granting Orr's motion for summary judgment.

## XIII. Limor, WCPO, Morford, and Fee

{¶ 56} Private-figure defamation plaintiffs must show by clear and convincing evidence that the defendant failed to act reasonably in attempting to discover the truth or falsity or defamatory character of the publication.[34]

---

34. See id.; *Baby Tenda of Greater Cincinnati, Inc. v. Taft Broadcasting Co.* (1989), 63 Ohio App.3d 550, 579 N.E.2d 522.

{¶ 57} Thus, to decide whether the trial court erred in granting summary judgment in favor of Limor, WCPO, Morford, and Fee, the question is whether reasonable minds could have found by clear and convincing evidence that Limor and WCPO had failed to act reasonably in attempting to discover the truth or falsity of the publications.[35] The focus is on the state of the evidence as it related to Limor's efforts to discover the truth of the broadcast statements.[36]

{¶ 58} Limor began to investigate FDCA based on complaints she received from Francis and Benoit. She tried to contract Fuchs for his comments, but she encountered unanswered telephone calls and full voice-mail boxes. Limor contacted the State Dental Board, the AG, and the BBB. The AG and the BBB noted the unusual number of complaints against FDCA, most of which were complaints about billing. Limor discovered that FDCA was involved in more than 180 lawsuits in Hamilton County. She also interviewed dentists not affiliated with FDCA about dental billing practices.

{¶ 59} At Fuchs's request, Limor obtained patient releases in an attempt to get patient records to confirm the complaints—but was stonewalled by Fuchs. Limor repeatedly tried to interview Fuchs. In the time the reports aired, Limor and WCPO received over 200 responses from former FDCA patients and employees. As Limor stated in her deposition, "When you look at the general context of the hundreds of people who contacted us, in addition to the hundreds involved either in lawsuits or with the Better Business Bureau * * * anything any one person said was multiple-sourced and backed up usually dozens of times * * * over. So every one person you saw on any of those stories has at least dozens of people standing behind him or her, saying the exact same thing."

{¶ 60} Fuchs and FDCA allege that WCPO and Limor defamed them by broadcasting claims that they had an improper relationship with the State Dental Board. The record shows that the Ohio State Dental Inspector had been on vacation twice with Fuchs. FDCA's former employees told Limor that Fuchs always seemed to know when inspections were imminent. Limor had no reason to doubt the claims, which she heard from multiple unconnected sources. Moreover, WCPO's broadcasts included statements by the board denying the allegations of an improper relationship with Fuchs.

{¶ 61} Fuchs and FDCA argue that Limor should have contacted dental insurance companies to "educate herself" about dental billing practices. But Fuchs himself prevented just such an investigation by refusing to turn over the patient records for which Limor had obtained releases.

---

35. See *Baby Tenda of Greater Cincinnati v. Taft Broadcasting Co.,* supra note 34.

36. See id.

{¶ 62} Fuchs and FDCA also argue that they were defamed in the March 26, 2003 broadcast by WCPO's use of stand-alone graphics informing viewers about the original complaints, which included "double billing." The "double billing" graphic must be construed within the content of the entire broadcast to determine any defamatory effect.[37] We have already determined that the statements by Francis and Benoit about the billing issues were essentially true. Therefore, WCPO was not liable for publishing them. Further, the gist or sting of the broadcasts was the poor customer service provided by FDCA and the cavalier attitude of FDCA toward its patients, not "double billing." And even though Fuchs refused to speak to Limor, she attempted to tell Fuchs's side of the story by reading portions of his letter during the broadcasts.

{¶ 63} Whether the claims were in fact true is not the issue—it is whether reasonable minds could find by clear and convincing evidence *that she did not act reasonably.* We are not sure what more she could have done, given the intransigence she encountered.

{¶ 64} We hold that no reasonable minds could have found with convincing clarity that Limor and WCPO had failed to act reasonably in attempting to discover the publications' truth or falsity. Thus, we hold that the trial court was correct in granting summary judgment for Limor, WCPO, Morford, and Fee.

## XIV. There Is No Issue

{¶ 65} The record contains nothing that raises a genuine issue of material fact. Having determined that Fuchs and FDCA have no case against any defendant, we overrule the assignment of error and affirm the trial court's judgment.

Judgment affirmed.

GORMAN, P.J., concurs.

Judge RUPERT A. DOAN was a member of the panel, but died before the release of this decision..

---

37. See *Early v. Toledo Blade* (1998), 130 Ohio App.3d 302, 720 N.E.2d 107.