[Cite as *Dudee v. Philpot*, 2019-Ohio-3939.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| JITANDER DUDEE, | : | APPEAL NO. C-180280 |
| Plaintiff-Appellant, | | TRIAL NO. A-1701319 |
| | : | *O P I N I O N.* |
| vs. | | |
| TIMOTHY PHILPOT, | : | |
| Defendant-Appellee. | : | |



Civil Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  September 27, 2019



*Stephen E. Imm*, for Plaintiff-Appellant,

*John C. Greiner*, for Defendant-Appellee.

**CROUSE, Judge.**

{¶1}   During his time on the family court bench, defendant-appellee Judge Timothy Philpot wrote a fictional novel in which he details multiple family court cases in an attempt to persuade readers of the importance of traditional Christian values regarding family and marriage.  One of the fictional cases described was the contentious divorce case of Dr. Gupta Patel, a character who plaintiff-appellant Dr. Jitander Dudee claims closely resembles him, a former litigant who appeared before Philpot.  Philpot portrays Patel as a deceitful and unfaithful husband who is hated by his children and who repeatedly lies to the court.  Dudee brought suit, claiming that he was defamed and portrayed in a false light by Philpot's statements about the fictional Patel.[1]

{¶2}   Dudee has now appealed from the trial court's grant of summary judgment in favor of Philpot on Dudee's claims of defamation and false-light invasion of privacy.

{¶3}   Dudee argues in one assignment of error that the trial court erred in granting summary judgment in favor of Philpot.  He presents five issues for review, (1) whether he presented evidence that Philpot's statements about him were false, (2) whether the trial court erroneously failed to consider a significant part of the defamatory material in the novel, (3) whether Philpot's statements that Dudee's children "hated him" could be determined by a reasonable fact-finder to be defamatory, (4) whether there was evidence in the record from which a reasonable

---

[1] Because Dudee claims to be Patel, we will refer to Dudee rather than the fictional Patel in our opinion.  We note that Philpot denies that Patel is Dudee.  For purposes of this opinion, we will assume they are the same.

fact-finder could conclude that Dudee was damaged by Philpot's defamatory statements about him, and (5) whether he presented evidence proving that Philpot's statements were false, and thus, cast Dudee in a false light.

***Factual Background***

{¶4}   Philpot has since retired from his position as a family court judge in Lexington, Kentucky.  Dudee is a medical doctor who practices in Lexington.  The novel, entitled *Judge Z: Irretrievably Broken,* discusses the contentious Patel divorce case for two of its 257 pages.  Dudee claims that Patel represents him, and that the following six statements made in the book are defamatory and violate his privacy by portraying him in a false light:

1. There was no longer any reason to tolerate his arrogance, affairs, and silence.

2. He had already been to jail twice for failing to pay. Then, after screaming under oath, "I have no money, I have no money," he always paid to get out.

3. He still owed money to his past two lawyers, and word gets around.

4. The next time he stayed in jail the full sixty days, growing a mangy beard and claiming various religious convictions no one had heard of to set up a discrimination suit against the jail and maybe even the judge.  He found out from Google that the judge was a Methodist and therefore must be biased against Hindus. But his wife had testified that in decades of marriage she had never seen any evidence of a devout Hindu living in her home.

5. He could see his kids, but they hated him.

6. He was a typical workaholic doctor at the University Hospital.

{¶5} Philpot included the following disclaimer at the beginning of his novel—"All of the characters in this book are creations of the author's imagination. This is a work of fiction. Any resemblance to real individuals is purely coincidental."

{¶6} The trial court granted summary judgment for Philpot on all counts, finding that all six of the statements were either not well-pled, substantially true, subject to the innocent-construction rule, nonverifiable opinion, or nonverifiable hyperbole.

### *Standard of Review*

{¶7} The standard of review for a grant of summary judgment is de novo. *Esber Beverage Co. v. Labatt USA Operating Co., L.L.C.,* 138 Ohio St.3d 71, 2013-Ohio-4544, 3 N.E.3d 1173, ¶ 9. Under Civ.R. 56, summary judgment will be granted when the moving party shows

> that no genuine issues as to any material fact remain; the moving party is
> entitled to judgment as a matter of law; and it appears from the evidence
> that reasonable minds can come to but one conclusion, and viewing such
> evidence most strongly in favor of the party against whom the motion for
> summary judgment is made, the conclusion is adverse to that party.

*Amankwah v. Liberty Mut. Ins. Co.,* 2016-Ohio-1321, 62 N.E.3d 814, ¶ 9 (1st Dist.).

### *Defamation*

{¶8} "Defamation is the publication or communication of a false statement of fact that injures someone by adversely affecting the person's reputation, business, or position—by exposure to public hatred, contempt, ridicule, shame, or disgrace."

4

*Fuchs v. Scripps Howard Broadcasting. Co.,* 170 Ohio App.3d 679, 2006-Ohio-5349, 868 N.E.2d 1024, ¶ 28 (1st Dist.).

{¶9}   Defamation includes both libel and slander.  *Gilson v. Am. Inst. of Alternative Medicine,* 2016-Ohio-1324, 62 N.E.3d 754, ¶ 37 (10th Dist.).  Libel refers to written or printed defamatory words, while slander refers to spoken defamatory words.  *Id.*

{¶10}  In *Thomas v. Cohr, Inc.,* 197 Ohio App.3d 145, 2011-Ohio-5916, 966 N.E.2d 915, ¶ 24 (1st Dist.), this court discussed the five essential elements of a claim of defamation.

> A private person who brings a defamation claim must plead and prove:
> (1) a false and defamatory statement, (2) about the plaintiff, (3) published
> without privilege to a third party, (4) with fault or at least negligence on
> the part of the defendant, and (5) that was either defamatory per se or
> caused special harm to the plaintiff.

*Id.*

{¶11}  Substantial truth is a complete defense to defamation.  *Fuchs* at ¶ 48. For purposes of summary judgment in a defamation case, the court must view the truthfulness of the statements in favor of the nonmoving party—i.e., assume the statements are false until shown to be true by the moving party.  *Brown v. Lawson*, 169 Ohio App.3d 430, 2006-Ohio-5897, 863 N.E.2d 215, ¶ 22 (1st Dist.).

### *Does Patel Represent Dudee?*

{¶12}  Philpot claims that Patel is a "composite character," representative of multiple real-life litigants.  In his motion for summary judgment, Philpot argued that

Patel did not represent Dudee, and so the trial court should grant summary judgment because the statements were not about Dudee.

{¶13} In order to be defamatory, words must refer to some ascertained or ascertainable person, who then has standing to sue. *Smith v. Huntington Pub. Co.*, 410 F.Supp. 1270, 1273 (S.D.Ohio 1975), *aff'd*, 535 F.2d 1255 (6th Cir.1976) (applying Ohio law).

{¶14} In works of fiction, the test for identification is whether a reasonable person could reasonably believe that the article referred to the plaintiff after comparing the characteristics of the plaintiff with those of the fictional character. *Id.* Neither the intent of the author, nor the recognition by the plaintiff that the article might be about him, are relevant to identification. *Id.*

{¶15} The author in *Smith* wrote an article describing drug dependency, and tried to conceal the identity of the drug-addicted subject of the article by using the generic name "Randy Smith" to describe the subject. *Id.* at 1272. A real person named Randy Smith who lived in the area sued the author for defamation after the article was published in the local newspaper. *Id.* at 1272.

{¶16} There were many similarities between the plaintiff and the fictional Randy Smith in the article. Both lived in the same small town, were 18-year-old males, and had mothers involved in the drug-dependency program from which the author drew his inspiration. *Id.* at 1273. The court found the similarities sufficient that a person who "only knew the plaintiff casually, or who had not seen him in some time might reasonably believe that the article concerned the plaintiff * * *." *Id.*

{¶17} Ultimately, the court in *Smith* granted summary judgment for the defendant due to the innocent-construction rule, and because the article contained a clear disclaimer that all names in the article were fictitious. *Id.* at 1274.

{¶18} Philpot admits that the novel is a thinly-veiled autobiography. Also, Charlene Dudee, Dudee's ex-wife, said in an affidavit, "It was immediately obvious to me upon reading this section of the book that Gupta and Connie Patel represent Jitander and myself."

{¶19} Here are some of the most striking similarities between the fictional Patel character and Dudee: (1) both Patel and Dudee were litigants in contentious divorce cases in front of Judge Philpot, (2) both are medical doctors, (3) both are from India, (4) both married American women they met during residency (Charlene is Dudee's ex-wife, Connie is Patel's ex-wife), (5) Dudee's annual income at the time of the divorce was nearly identical to Patel's, (6) both were ordered to give up "million dollar" houses, (7) Patel was jailed twice for contempt of court for failing to pay maintenance, Dudee was jailed three times for the same reason, (8) Patel claims that the fictional Judge Z is biased against Hindus, Dudee complained to the Kentucky Judicial Conduct Commission that Philpot was biased against nonChristians, (9) Patel owed money to two different lawyers, Dudee owed money to four different law firms, (10) Judge Z accused Patel of hiding money from the court, Philpot held in multiple rulings that Dudee had hidden funds from the court, and (11) Judge Z says Patel came to court with a beard and a dot on his forehead, Dudee had a beard and a dot on his forehead during at least one hearing before Philpot.

{¶20} There are also some differences. (1) Patel has three teenage children, Dudee has four young children, (2) Patel purchased a house during the divorce and

paid cash, Dudee remained in the marital home, (3) Patel completed his residency in 1979, Dudee was 12 years old in 1979, (4) Patel worked at a university hospital and then a small hospital in Corbin, Kentucky, while Dudee owned his own ophthalmology clinic and never worked at a hospital in Corbin, Kentucky.

{¶21} In *Smith,* the disclaimer at the beginning of the news article was one of the primary reasons the court held that the statements were not about the plaintiff. However, Philpot's disclaimer in the novel carries less effect than the one in *Smith*. In *Smith*, the disclaimer appeared in bold before the article, and then once the plaintiff expressed his concerns to the newspaper, the newspaper emphasized the disclaimer again by publishing it in the clarifications section of the next day's paper.

{¶22} In Philpot's novel, the disclaimer is on the same page as the contact information of the author and publisher, and is situated in between the copyright warning and other text. The text of the disclaimer does not stand out in any way. Also, the similarities between Patel and Dudee are more numerous and more substantive than the plaintiff and the fictional character in *Smith*.

{¶23} When the court declines to grant summary judgment for the defendant on the issue of whether a fictional character depicts a plaintiff, it becomes an issue of fact for the jury to decide. *See Smith v. Stewart,* 291 Ga.App. 86, 93, 660 S.E.2d 822 (2008).

{¶24} The trial court wrote in its decision that Patel represents Dudee, and declined to grant Philpot's motion for summary judgment on that issue. There is a genuine issue of material fact as to whether Patel represents Dudee, and so we proceed to an analysis of the statements themselves. In other words, even if a trier of fact found that Patel represents Dudee, does Dudee have viable claims?

***"There was no longer any reason to tolerate his arrogance, affairs, and silence."***

{¶25} The trial court found this statement to be substantially true because the record in the divorce case established that Dudee had an affair.

{¶26} At the final property and maintenance hearing on March 16, 2006, Charlene testified several times regarding Dudee's infidelity. She stated that Dudee was unfaithful before she was ever unfaithful. In regards to an attempt at reconciliation, Charlene testified that "[i]t appears that, you know, he'd been seeing other women after we separated and, you know, it appeared that we forgave each other and wanted to move on and try to see if we could make it work." With regards to a second attempt at reconciliation, Charlene said that at the time she knew he had been seeing other people. She claimed that he admitted to her that he had been "inappropriate" with three of his employees after one tried to sue him for sexual harassment. She testified that she witnessed him kissing another woman. She found sexually explicit emails between Dudee and his ex-girlfriend. Dudee did not testify during the hearing, and so Charlene's testimony serves as the only evidence on the issue of Dudee's infidelity.

{¶27} At trial, Charlene's testimony served as sufficient, and unopposed, evidence that Dudee was unfaithful during the marriage. Nevertheless, attached to his memorandum opposing summary judgment, Dudee submitted an affidavit in which he swears that he never committed an act of infidelity during his marriage. He also submitted an affidavit from Charlene in which she swears "[b]ased on information known and available to me, I do not believe that Jitander was unfaithful during our marriage." Charlene's affidavit was sworn on January 19, 2018, nearly 12 years after Charlene testified at the final property and maintenance hearing.

Charlene's affidavit effectively recants her testimony and casts doubt on the only evidence of Dudee's infidelity. Dudee claims that these affidavits create a genuine issue of material fact.

{¶28} In response, Philpot argues that collateral estoppel prevents Dudee from relitigating the truth of his infidelity, and so it does not matter that Charlene signed an affidavit recanting her testimony.

{¶29} Collateral estoppel prevents an issue from being relitigated where (1) the party against whom estoppel is sought was either a party or in privity with a party to the prior action; (2) a final judgment was rendered on the merits in the previous action following a full and fair opportunity to litigate the issue; (3) the issue on which estoppel is sought was either admitted or actually tried and decided in the prior action, and was necessary to the final judgment; and (4) the issue in the current case is identical to the issue involved in the prior suit.

*Monahan v. Eagle Picher Industries, Inc.,* 21 Ohio App.3d 179, 181, 486 N.E.2d 1165 (1st Dist.1984).

{¶30} Where the defendant clearly has had his day in court on the specific issue brought into litigation at the later proceeding, he is estopped from relitigating that issue. *Goodson v. McDonough Power Equip., Inc.,* 2 Ohio St.3d 193, 200, 443 N.E.2d 978 (1983). Collateral estoppel should not be applied where a party could not foresee that the issue would be subsequently utilized collaterally and the party had little knowledge or incentive to fully and vigorously litigate the issue in the first case. *Id.* at 201.

{¶31} In Kentucky, fault may be considered in divorce cases when determining the amount of maintenance to be awarded in order to prevent a windfall

to the faulty party seeking maintenance. *Platt v. Platt,* 728 S.W.2d 542, 543 (Ky.App.1987).

{¶32} In the divorce case, Dudee alleged that Charlene had been unfaithful, and moved to reduce the amount of maintenance he was required to pay her. Judge Philpot issued a final judgment entitled "Findings of Fact, Conclusions of Law and Amended Decree." Philpot examined the infidelity of both Dudee and Charlene when deciding whether Charlene's "fault" should alter the amount of maintenance she was owed. At the hearing, Charlene admitted to having an affair. She also testified about Dudee's affairs. In his Amended Decree, Philpot decided not to alter the amount of maintenance to be paid to Charlene, stating "According to [Charlene's] <u>uncontroverted</u> testimony, [Dudee] engaged in similar affairs during the marriage. There is plenty of fault on both sides." (Emphasis in original.)

{¶33} Regarding the first two prongs, the party against whom estoppel is sought (Dudee) is the same in the present case as in the divorce case. There was a hearing on the issue, which presented Dudee with a full and fair opportunity to litigate the issue of his infidelity. After the hearing, Judge Philpot issued a final judgment on the merits.

{¶34} On the third prong, the issue of Dudee's infidelity was actually decided by Judge Philpot when he said, "[Dudee] engaged in similar affairs during the marriage." During his deposition, Philpot testified that he did not think the infidelity of Dudee was relevant to any of the decisions he made in the divorce case. But, his memory is belied by the amended decree. His finding that Dudee was unfaithful was crucial to Philpot's decision to not alter Charlene's maintenance payments. Maintenance payments constituted a significant issue in the case overall, which is why Dudee moved for a hearing to have the maintenance payments reduced in the

first place. So, while it may not have been necessary as a matter of law that Philpot find Dudee unfaithful when deciding not to reduce the maintenance payments, his infidelity was necessary to Philpot's ultimate determination. Despite Charlene's affairs, Philpot did not reduce the amount of maintenance to be paid because "there is plenty of fault on both sides."

{¶35} The fourth prong requires us to determine whether the current issue is identical to the issue in the divorce case. The threshold issue Philpot was deciding at the final property hearing was whether Charlene was unfaithful and therefore at fault, not whether Dudee was unfaithful. Dudee argues that the hearing was meant to determine Charlene's fault and whether the amount of maintenance due to her should be reduced as a result, and that since he was not seeking maintenance, his infidelity was not the issue to be litigated.

{¶36} While the threshold issue may have been to determine Charlene's infidelity, Dudee's infidelity became an issue when Charlene testified. Dudee had incentive to fully and vigorously litigate the issue of his infidelity, because not to do so would leave Charlene's testimony unrefuted, and would effectively concede that he had been unfaithful. In attempting to modify Charlene's maintenance payments, he had strong incentive to not only show that Charlene was at fault, but also that he was not at fault, especially after Charlene raised the issue of his infidelity. Dudee had his day in court on the issue of his infidelity.

{¶37} If collateral estoppel did not bar relitigation of Dudee's unfaithfulness, his and Charlene's affidavits may have created a genuine issue of material fact as to that issue. But, collateral estoppel bars relitigation of the issue of Dudee's infidelity, and so the trial court did not err when it granted summary judgment on the infidelity statement.

*"He had already been to jail twice for failing to pay. Then, after screaming under oath, 'I have no money, I have no money,' he always paid to get out."*

{¶38} Dudee argues that reading this statement in the context of the other statements about Patel leads the reader to believe that Dudee committed perjury when he testified that he was unable to pay. The trial court found this statement to be substantially true, holding that the record in the divorce case established that Dudee did claim to not have money to pay, and then later paid.

{¶39} Both parties agree that Dudee went to jail three times for failing to pay his obligations. Dudee also acknowledged in his deposition that during his divorce-trial testimony he said something similar to "I have no money, how am I going to pay, how do you expect me to pay?" Dudee then said that he borrowed money from his girlfriend in order to make his contempt payments and get out of jail.

{¶40} In his order dated October 27, 2005, Philpot was not convinced that Dudee was unable to comply with court orders to pay, found that Dudee had assets which enabled him to pay, and held him in contempt for failure to pay.

{¶41} On June 9, 2006, Philpot found Dudee in contempt for failure to pay attorney fees and maintenance obligations. Philpot found that Dudee "has the ability to pay these amounts, but chooses not to do so."

{¶42} In his "Findings of Fact, Conclusions of Law, and Decree," Philpot found that Dudee "failed to disclose many assets throughout these proceedings," including the purchase of a thoroughbred race horse and commercial real estate. Philpot also found that Dudee "attempted to conceal assets" by diverting money from the marital estate to other bank accounts, such that Philpot ordered Dudee to restore $85,000 to the marital estate.

{¶43} Philpot's findings and orders throughout the divorce case indicate that Dudee concealed assets and failed to pay, and was jailed as a result. There are no genuine issues of material fact as to the truth of the statement.

***"He still owed money to his past two lawyers, and word gets around."***

{¶44} The trial court found this statement to be substantially true. Although the broader context of the passage about Patel is that he was deceitful and refused to pay his obligations, the immediate context surrounding this statement conveys a different meaning. The statement appears in this context—"no lawyer would touch his lawsuit. And now he was 'pro se,' meaning he represented himself and had a fool for a client. He still owed money to his past two lawyers, and word gets around."

{¶45} When read in context, it is clear that the statement is meant to communicate that Patel did not pay his lawyers' fees, and so now he could not find a lawyer to take his case. "Word gets around" that Patel does not pay his legal fees. It is undisputed that Dudee failed to pay his legal fees. When Dudee filed for bankruptcy on August 2, 2011, he owed legal fees to four different law firms for legal work done on his behalf. The statement is substantially true, and there is no genuine issue of material fact with regards to this statement.

***"The next time he stayed in jail the full sixty days, growing a mangy beard and claiming various religious convictions no one had heard of to set up a discrimination suit against the jail and maybe even the judge. He found out from Google that the judge was a Methodist and therefore must be biased against Hindus. But his wife had testified that in decades of marriage she had never seen any evidence of a devout Hindu living in her home."***

{¶46} The trial court did not review the merits of this statement because the statement was not pled in the complaint as a defamatory statement, or as a false-light invasion of privacy.

14

{¶47} In paragraph 11 of his complaint, Dudee listed the statements he claimed were defamatory, and did not include the religious statement among them. Dudee did reference his religious convictions in paragraph nine of the complaint where he discussed the similarities between Patel and himself, but he did not identify any statement from the book regarding his religious convictions as being false or defamatory.

{¶48} In *Boutsicaris v. Akron Gen. Med. Ctr.*, 9th Dist. Summit No. 17941, 1997 WL 270552, *6 (May 14, 1997), the defamation-plaintiff did not specifically identify which statements made by the defendants were defamatory. Instead, he merely alleged in the complaint that the defendants had made false and defamatory statements which denigrated his skills as a physician. *Id.* The court found that the language of the complaint clearly identified the substance of the defamatory statements and determined the defamation claim to be well-pled. *See id.*

{¶49} Dudee's case is distinguishable from *Boutsicaris.* In his complaint, Dudee identified the specific statements which he believed to be defamatory. Nowhere in his complaint does he allege that the defendant made false statements regarding his religious convictions. In fact, it was only in the portion of his complaint where he listed out the similarities between himself and Patel that Dudee mentioned anything about religious convictions. This was insufficient to put Philpot on notice that the statement was being alleged as a defamatory statement. In *Boutsicaris*, the plaintiff clearly identified the substance of the defamatory statements—that the defendants denigrated his skills as a physician. Dudee failed to clearly identify the substance of any defamatory statements regarding his religious convictions.

{¶50} The statement regarding Dudee's religious convictions was not pled as a defamatory statement, and so the trial court did not err when it granted summary judgment as to that statement.

### *"He was a typical workaholic doctor at the University Hospital."*

{¶51} The trial court found the workaholic statement to be nonverifiable and hyperbole. In his appellate brief, Dudee did not present the workaholic statement as an issue for review under his assignment of error. In fact, he only mentioned the workaholic statement twice in his brief. First, he made a blanket assertion in his statement of facts that certain statements in the novel are defamatory, and included the workaholic statement in that assertion. Second, he mentioned the workaholic statement during his argument regarding the "kids hated him" statement.

{¶52} "To receive consideration on appeal, trial-court errors must be argued and supported by citation to the record." *Berger v. Wade*, 1st Dist. Hamilton No. C-120863, 2014-Ohio-1262, ¶ 25. It is not the appellate court's duty to make appellant's argument where he fails to make one on his own. *See id.*; *see also James v. My Cute Car, LLC,* 10th Dist. Franklin No. 16AP-603, 2017-Ohio-1291, ¶ 10 ("the burden of affirmatively demonstrating error on appeal rests with the party asserting error.").

{¶53} Nowhere in Dudee's brief did he argue why the statement is defamatory, or in any way refute the trial court's holding that the statement is nonverifiable and hyperbole. Simply mentioning the statement a couple of times in the brief does not suffice as argument. It is not this court's job to make Dudee's argument for him.

{¶54} Regardless, the trial court did not err in finding the statement to be nonverifiable and hyperbole. A totality-of-the-circumstances test is used to determine whether a statement is fact or mere hyperbole or opinion. *Vail v. The Plain Dealer Publishing Co.,* 72 Ohio St.3d 279, 282, 649 N.E.2d 182 (1995). The court should consider the "specific language used, whether the statement is verifiable, the general context of the statement, and the broader context in which the statement appeared." *Id.* Where a statement "lacks a plausible method of verification, a reasonable reader would not believe that the statement has specific factual content." *Id.* at 283.

{¶55} When determining whether a statement is hyperbole or opinion, the court must consider whether the language used is meant to elicit an emotional response, and whether the language is ambiguous or has a readily ascertainable meaning. *Brown v. Lawson,* 169 Ohio App.3d 430, 2006-Ohio-5897, 863 N.E.2d 215, ¶ 17 (1st Dist.).

{¶56} The broader context of the statement leans towards fact. Although the book is geared towards persuasion, its general tenor is factual. The novel was written by a family court judge, and a reasonable reader could easily believe that the novel accurately depicts actual court cases.

{¶57} But, the general context, the language used, and the fact that the statement is nonverifiable all lean towards opinion and hyperbole. The statement was made in the following general context: "he was a typical workaholic doctor at the University hospital. Connie Patel put up with the doc because he made nearly a half-million a year. Interesting how thirty-five thousand a month can cover a lot of husbandly failure."

{¶58} The specific language—"workaholic"—is ambiguous and lacks a precise meaning. Philpot is stating his opinion, phrased hyperbolically, that Dudee is a neglectful husband who places work over family, none of which is verifiable. The statement is nonverifiable and hyperbole.

{¶59} Dudee did not properly present the workaholic statement for our review on appeal. Nonetheless, after discerning an argument as best as we can, it is clear that the trial court did not err in granting summary judgment because no genuine issue of material fact remains regarding this statement.

### *"He could see his kids, but they hated him"*

{¶60} The trial court found this statement to be an opinion, nonverifiable, and hyperbole. However, we find that the statement may be verifiable due to the implication that Philpot, as the family court judge presiding over the case, has private, first-hand knowledge about the children's feelings towards Dudee.

{¶61} Subjective emotions are not verifiable. *Stholmann v. WJW TV, Inc.*, 8th Dist. Cuyahoga No. 86491, 2006-Ohio-6408, ¶ 27. But, when the author indicates that he has "private, first-hand knowledge which substantiates the opinion he expresses, the opinion becomes as damaging as an assertion of fact." *Scott v. News-Herald*, 25 Ohio St.3d 243, 251, 496 N.E.2d 699 (1986).

{¶62} "Liability for libel may attach when a negative characterization of a person is coupled with a clear, but false implication that the author is privy to facts about the person that are unknown to the general reader." *Hotchner v. Castillo-Puche*, 551 F.2d 910, 913 (2d Cir.1977).

{¶63} What would otherwise likely be a nonverifiable opinion may be considered a statement of fact due to the context of the statement and the speaker-

defamer's position within a company or organization. *Wayt v. DHSC, LLC,* 2017-Ohio-7734, 97 N.E.3d 903, ¶ 138 (5th Dist.), *rev'd on other grounds,* 155 Ohio St.3d 401, 2018-Ohio-4822, 122 N.E.3d 92, ¶ 138. In *Wayt,* the court considered the speaker's position as director of human resources in finding the defamatory statement to be verifiable. *Id.*

{¶64} As discussed previously, in determining whether the "kids hated him" statement is fact or opinion, we look to the broader context of the statement, the general context, the specific language used, and whether the statement is verifiable. *Vail,* 72 Ohio St.3d at 282, 649 N.E.2d 182.

{¶65} The broader context leans towards fact because the general tenor is factual. The general context leans towards opinion because the author expresses his opinion that Patel and Connie's marriage was not a "love marriage" anymore. Also, the language used—"hate"—is meant to elicit an emotional response, and so leans towards hyperbole. *See Brown,* 169 Ohio App.3d 430, 2006-Ohio-5897, 863 N.E.2d 215, at ¶ 17.

{¶66} Finally, the statement would normally be considered nonverifiable since the judge cannot know the true feelings of the children. But, the context of the statement, and the author's role as the family court judge, could lead a reasonable reader to conclude that the children had communicated their feelings about their father to the judge during the court proceedings.

{¶67} Philpot's passage about Patel implies first-hand knowledge, and therefore could potentially cause us to take what would otherwise be a nonverifiable opinion and treat it as an assertion of fact. Nevertheless, we need not decide whether

19

the statement is verifiable because Dudee's failure to plead special damages is fatal to his claim with regards to the "kids hated him" statement.

### *Special Damages and Defamation Claims*

{¶68} In order for a statement to be defamatory per se, it must be defamatory upon the face of the statement. *Becker v. Toulmin*, 165 Ohio St. 549, 556, 138 N.E.2d 391 (1956). When a statement is only defamatory through interpretation, innuendo, or consideration of extrinsic evidence, then it is defamatory per quod and not defamatory per se. *Id.* When the statement is defamatory per se, special damages need not be pled or proven, they are presumed. *Id.* at 553. In an action for defamation per quod, special damages must be pled and proven. *Id.* at 556.

{¶69} In order for a statement to be defamatory per se, it must fall into one of three categories:

(1) the imputation of a charge of an indictable offense involving moral turpitude or infamous punishment, (2) the imputation of some offensive or contagious diseases calculated to deprive the person of society, or (3) having the tendency to injure the plaintiff in his trade or occupation.

*Williams v. Gannett Satellite Information Network, Inc.,* 162 Ohio App.3d 596, 2005-Ohio-4141, 834 N.E.2d 397, ¶ 8 (1st Dist.).

{¶70} The "kids hated him" statement is not defamatory per se, and Dudee does not argue that it is. Therefore, it can only be defamatory per quod, and so Dudee was required to plead special damages.

{¶71} Special damages are distinct from general damages. General damages are those which are a necessary consequence of the harm; they are implied by law

and do not need to be pled. *Klein Structural Steel Co. v. John J. Pool Co.,* 26 Ohio App. 420, 423, 160 N.E. 520 (6th Dist.1927); *See F.A.A. v. Cooper,* 566 U.S. 284, 295-296, 132 S.Ct. 284, 182 L.Ed.2d 497 (2012) (in defamation cases, general damages "cover loss of reputation, shame, mortification, injury to the feelings and the like").

{¶72} As stated in our recent case of *Martin v. Wegman,* 1st Dist. Hamilton Nos. C-180268 and C-180308, 2019-Ohio-2935, ¶ 15, "special damages are those direct financial losses resulting from the plaintiff's impaired reputation, such as lost profits to his business." Where a defamation plaintiff has not claimed a pecuniary harm, an economic harm, or any specific harm related to his profession, he has failed to plead special damages. *Id.* at ¶ 20. Also, Civ.R. 9(G) requires that claims for special damages in cases of defamation per quod be pled with specificity. *Id.* at ¶ 19.

{¶73} In his complaint, Dudee claimed that as a result of Philpot's statements, he suffered "humiliation, embarrassment, anxiety, mental anguish, emotional distress, and damage to his reputation and career." He has not claimed a pecuniary harm, an economic harm, or any specific harm related to his profession. Therefore, he has failed to plead special damages at all, much less with the specificity required by Civ.R. 9(G). The trial court did not err when it granted summary judgment on the "kids hated him" statement.

### False-Light Invasion of Privacy

{¶74} Dudee contends that the trial court erred in finding that his false-light claim fails because three of the statements (infidelity, hiding money from the court, and failure to pay his attorneys) are substantially true, and the "kids hated him" statement is an opinion.

{¶75} In *Welling v. Weinfeld*, 113 Ohio St.3d 464, 2007-Ohio-2451, 866 N.E.2d 1051, ¶ 61, the Ohio Supreme Court formally adopted the false-light invasion-of-privacy claim under Ohio law.

> [O]ne who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Id.*

{¶76} If the statement is true, then there is no false light. *Id.* at ¶ 52. To be highly offensive, the plaintiff must be justified in the eyes of the community in feeling seriously offended and aggrieved by the publicity. *Id.* at ¶ 55. The statement must be "such a major misrepresentation of his character, history, activities or beliefs that serious offense may reasonably be expected." *Id.*

{¶77} As discussed above, the statements about hiding money from the court and not paying his attorneys are substantially true, and collateral estoppel prevents Dudee from relitigating the truth of the infidelity statement.

{¶78} Also, as discussed above, the implication of first-hand knowledge could turn the "kids hated him" statement from nonverifiable hyperbole into a statement of fact. But, since Dudee did not properly plead special damages, his false-light claim fails just the same as his defamation claim.

### Special Damages and False-Light Claims

{¶79} Whether a claim for false-light invasion of privacy based on language that is defamatory per quod requires a plaintiff to plead special damages appears to be an issue of first impression in Ohio. Ohio courts have found it desirable to impose certain procedural limitations on defamation actions. This includes a statute of limitations on all defamation actions, and requiring a plaintiff to plead and prove special damages in defamation-per-quod actions. Ohio, and the majority of other states, applies the defamation statute of limitations to false-light claims. *Stout v. FedEx Ground Package Sys., Inc.,* N.D. Ohio No. 3:14-CV-02169, 2015 WL 7259795, *3 (Nov. 17, 2015).

{¶80} California statutorily requires the pleading of special damages in defamation-per-quod cases. *Fellows v. Natl. Enquirer, Inc.*, 42 Cal.3d 234, 235, 228 Cal.Rptr. 215, 721 P.2d 97 (1986). The California Supreme Court found this requirement to apply to false-light claims based on language that is defamatory per quod as well. *Id.* at 251. The court held that to find otherwise would circumvent the statutory "zone of protection" afforded to the press by allowing plaintiffs to take statements which fail on defamation-per-quod grounds due to a lack of special damages, and to plead them as false-light claims in order to get around the special-damages requirement. *Id.* at 250.

{¶81} Illinois followed suit in *Schaffer v. Zekman*, 196 Ill.App.3d 727, 736, 554 N.E.2d 988 (1990), agreeing with the California Supreme Court in *Fellows*, and finding that special damages were required in false-light actions "based on language, the defamatory meaning of which can be established only by reference to extrinsic facts."

23

In considering the applicability of the special damages requirement to a false-light claim, the *Fellows* court acknowledged the evolution of restrictions and limitations on liability for defamatory speech as courts and legislatures attempted to balance the interest in a person's reputation against the interests in freedom of speech and press. It suggested the requirement of special damages in a per quod action represented a legislative determination that the imposition of liability for a publication which afforded no warning of its defamatory nature, and did not cause actual pecuniary injury, placed too great a burden on the editorial process and interfered with the free dissemination of news. The court also recognized that privacy suits threaten the freedoms of speech and press in the same manner as defamation actions.

*Id.* at 735.

{¶82} While related, false light and defamation are different causes of action. False light often serves as an additional or alternative remedy for defamatory statements, but a plaintiff need not be defamed to have a cause of action for false-light invasion of privacy. Restatement of the Law 2d, Torts, Section 652(E) (1977). False-light claims are separate and distinct from defamation because they protect a different interest—harm to character, reputation, or trade (defamation) vs. publicity of false information (false light). A claim for false-light invasion of privacy is not an avenue for plaintiffs to get into court due to their failure to otherwise set forth a defamation claim.

{¶83} Since claims for false light and defamation are so closely related, the procedural limitations developed by courts over the years on defamation claims

(statute of limitations, special damages, etc.) should be applied to false-light claims. The Ohio Supreme Court adopted the false-light cause of action not because it wanted plaintiffs to have an alternative cause of action where they could not sustain a defamation claim due to a lack of special damages, but because it wanted to give plaintiffs the ability to protect their interests against having false information publicized about them. *See Welling,* 113 Ohio St.3d 464, 2007-Ohio-2451, 866 N.E.2d 1051, at ¶ 39, 50, 60.

{¶84} When discussing the standard of fault required for both types of claims, the *Welling* court held that "False light defendants enjoy protections at least as extensive as defamation defendants." *Id.* at ¶ 58. This suggests that the same limitations that apply to defamation claims apply to false-light claims. *See id.*

{¶85} We therefore hold that whenever a false-light invasion-of-privacy claim is based on language that is defamatory per quod, pleading and proof of special damages is required. Dudee's false-light claim for the "kids hated him" statement falls in the category of per quod, and so requires that special damages be pled. As discussed above, Dudee failed to plead special damages. Therefore, his claim for false-light invasion of privacy based on the "kids hated him" statement fails, and the trial court did not err when it granted summary judgment on that statement.

### *Conclusion*

{¶86} The trial court did not err when it granted summary judgment on all of Dudee's claims for defamation and false-light invasion of privacy. Dudee's sole assignment of error is overruled.

Judgment affirmed.

**MYERS, P.J.,** and **WINKLER, J.,** concur.


Please note:

The court has recorded its own entry on the date of the release of this opinion.